**REVISED**

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 95-20134
_____


ALVIN URIAL GOODWIN, III,

                    Petitioner-Appellant,

v.

GARY L. JOHNSON, Director,
Texas Department of Criminal Justice,
Institutional Division,

                    Respondent-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Texas
_____
January 15, 1998

Before KING, JOLLY, and DEMOSS, Circuit Judges.

KING, Circuit Judge:

     The opinion entered in this cause on December 23, 1997, is

withdrawn, and the following opinion is substituted therefor.

Alvin Urial Goodwin, a Texas death row inmate convicted of

capital murder, challenges the district court's denial of his

petition for a writ of habeas corpus.  Goodwin has alleged, among

other things, that his appellate counsel provided

constitutionally ineffective assistance because he failed to

raise a state law issue that would have required reversal on

1

direct appeal.  We affirm the district court's denial of habeas relief on this claim because the trial court's error that formed the basis of this omitted issue on appeal did not render Goodwin's trial fundamentally unfair or its result unreliable. We also affirm the judgment of the district court denying relief in all other respects, except that we vacate that portion of the district court's judgment denying Goodwin habeas relief on his Fifth Amendment claim and remand for an evidentiary hearing to resolve the fact issue underlying that claim.

## I.  FACTUAL BACKGROUND

On December 1, 1986, Montgomery County Sheriff's deputies received a report of a theft at the trailer house of James Douglas Tillerson.  Further investigation revealed that Tillerson's trailer house had been ransacked and that a VCR, some video cassettes, phonograph records, and a bayonet were missing from the house.  Tillerson had not reported for work that morning and had not been seen since the previous Sunday.  On January 17, 1987, trail riders discovered Tillerson's body approximately two and one-half miles from his trailer at the edge of the woods near Fawnmist Road in Montgomery County.  An examination of Tillerson's body disclosed that he had been dead for approximately one month and had died from a gun-shot wound to the head.  A second gun-shot wound had been made by a bullet entering Tillerson's right arm and exiting at the forearm.  A bullet was recovered from the body's clothing and fragments of a bullet were later discovered in the immediate area where the body had been

2

found.

Friends of Tillerson informed police that Tina Atkins, also a friend of the victim, had told them that a VCR, bayonet, and several video tapes from Tillerson's trailer were now at the house where she lived with her father, Billy Dan Atkins, Sr. Tina Atkins was able to name the titles of the video tapes, which corresponded with the titles of the tapes missing from Tillerson's trailer. Based on the information that she provided, a search warrant was issued for the residence of Billy Dan Atkins, Sr., who informed police that he had retrieved the items from the car of his son, Billy Dan Atkins, Jr. (Atkins).

Further investigation revealed that Atkins, Goodwin, Glenn Dierr, and Fred Meadows had been arrested for unlawful possession of a firearm by a felon on December 4, 1986, in The Woodlands, Texas. Following the arrest, Dierr stated during a police interview that he had been walking in the woods near Huntsville, Texas with Goodwin on December 5 when Goodwin showed him a fence post into which Goodwin claimed he had fired several rounds of a .357 magnum pistol. Goodwin also told Dierr that he had "blown someone away" with the weapon five weeks earlier and that the body was still in the woods. Ballistics testing revealed that all of the projectiles and hulls recovered on or near Tillerson's body were fired from a Smith & Wesson .357 magnum that had been found with Atkins, Goodwin, Dierr, and Meadows at the time of their arrest in The Woodlands.

On January 20, 1987, Texas law enforcement officials were

3

notified that Goodwin and Atkins had been arrested and were in custody in Burlington, Iowa. During an interview in Iowa on January 21, the Texas officers told Goodwin that they had found the weapon used to kill Tillerson and that it was the same weapon taken from Atkins's car on December 4, 1986. Goodwin then admitted to having shot Tillerson and gave a videotaped confession to that effect. Goodwin waived extradition and was flown back to Montgomery County that evening.

The next morning, Texas law enforcement officials interviewed Goodwin in Montgomery County, and he later gave a written confession. According to Goodwin's written confession, on the night of the murder, he and Atkins drove by Tillerson's trailer between 8:00 and 10:00 p.m. Atkins and Goodwin had discussed the possibility of either obtaining a loan from Tillerson or robbing him. When Tillerson answered the door of his trailer home, Atkins and Goodwin entered and drew handguns. Atkins ordered Tillerson to sit down in a chair and demanded money. When Tillerson claimed that he had no money, Atkins ransacked the trailer. Unable to find more than some change, Atkins collected other items from the trailer. Atkins then ordered Tillerson to get dressed. Goodwin held his gun on Tillerson while Atkins loaded the items into his car. Atkins, Goodwin, and Tillerson left in Atkins's car, with Atkins driving, Tillerson in the back seat, and Goodwin in the front seat, pointing his gun at Tillerson. Atkins eventually stopped near a wooded area where he ordered Tillerson to get out of the car and

walk ahead of Atkins and Goodwin into the woods. Atkins raised his gun, aimed at Tillerson and pulled the trigger two or three times, but the weapon did not discharge. Goodwin raised his gun, turned his head, and fired at Tillerson. Tillerson fell to the ground screaming. Thinking that he had only grazed the victim, Goodwin quickly raised his weapon and fired a second shot. When Goodwin saw blood coming out of Tillerson's head, he ran back to Atkins's car.

## II. PROCEDURAL POSTURE

A Texas jury found Goodwin guilty of the murder of James Douglas Tillerson and sentenced Goodwin to death. The Texas Court of Criminal Appeals affirmed Goodwin's conviction, see Goodwin v. State, 799 S.W.2d 719 (Tex. Crim. App. 1990), and the United States Supreme Court denied certiorari, see Goodwin v. Texas, 501 U.S. 1259 (1991).

Goodwin filed two petitions for writ of habeas corpus in state district court. The state district court declined to conduct an evidentiary hearing on either petition and recommended that both applications be denied. The state district court's orders recommending the denial of the petitions contain no findings of fact or conclusions of law; they merely state that "the Court . . . finds that there are no controverted, previously unresolved facts material to the lawfulness of the confinement of applicant." The Court of Criminal Appeals accepted the recommendation of the state district court as to both petitions and summarily denied relief without findings of fact or

5

conclusions of law.

On February 17, 1995, Goodwin filed a motion to proceed in forma pauperis (IFP), a motion for appointment of counsel in federal district court, a motion for stay of execution pending the completion of discovery and the submission of a formal habeas petition, and a formal motion for discovery. Goodwin's execution was scheduled for March 7, 1995. The district court granted the motions to proceed IFP and for appointment of counsel and denied the motions for stay and discovery.

Soon thereafter, Goodwin filed his federal petition for habeas relief and again filed motions for discovery, for a stay of execution pending the disposition of his habeas petition, and for an evidentiary hearing. The district court denied these motions. Goodwin appealed the denial of his second motion for a stay of execution, and we reversed the district court's order denying the stay and ordered the district court to enter an order staying Goodwin's execution pending determination of the merits of the claims presented in his federal habeas petition. The district court accordingly granted a stay.

Four days before Goodwin's scheduled execution date, the state answered and filed a motion for summary judgment on all of Goodwin's claims. Goodwin filed a cross-motion for partial summary judgment limited to his claim that his legal representation on direct appeal was unconstitutionally ineffective because his counsel failed to raise a meritorious claim that was properly preserved at trial.

6

The district court denied Goodwin's habeas petition, explaining its decision in a memorandum opinion. The district court also denied Goodwin's request for a certificate of probable cause to appeal (CPC) and lifted the stay of execution that it had previously imposed. Goodwin requested a CPC from this court to appeal the district court's denial of his petition for habeas relief. We granted a stay of execution, carried the request for CPC with the case, directed the parties to fully brief the appeal as on the merits, and heard full oral argument. Having concluded that a portion of the issues that Goodwin raises on appeal "are debatable among jurists of reason," we now grant the CPC and rule on the merits of the appeal. See Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983) (internal quotation marks omitted); Woods v. Johnson, 75 F.3d 1017, 1026 n.12 (5th Cir.), cert. denied, 117 S. Ct. 150 (1996).[1]

### III.  STANDARD OF REVIEW

The district court did not state that it was granting the state's motion for summary judgment when it denied Goodwin's habeas petition.  However, the district court's reference to documents outside of Goodwin's habeas petition demonstrates that

---

[1]  On April 24, 1996, the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214, was signed into law.  The AEDPA eliminates the CPC requirement of 28 U.S.C. § 2253 and substitutes a requirement that a petitioner seeking review of a district court's denial of a petition for federal habeas relief under § 28 U.S.C. 2254 obtain a certificate of appealability from a circuit judge.  Because Goodwin filed his habeas petition before April 24, 1996, "we review his petition for a CPC under the pre-AEDPA jurisprudence." Green v. Johnson, 116 F.3d 1115, 1120 (5th Cir. 1997).

7

the court implicitly granted the motion.  See FED. R. CIV. P. 12(c) (providing that the summary judgment procedures of Federal Rule Of Civil Procedure 56 are applicable if matters outside the pleadings are presented to, and not excluded by, the court).

"We review a grant of summary judgment de novo, applying the same criteria used by the district court in the first instance." Texas Manufactured Housing Ass'n v. City of Nederland, 101 F.3d 1095, 1099 (5th Cir. 1996), cert. denied, 117 S. Ct. 2497 (1997). "Summary judgment is appropriate if the record is devoid of a genuine issue of material fact."  Harris v. Johnson, 81 F.3d 535, 539 (5th Cir.), cert. denied, 116 S. Ct. 1863 (1996) (applying summary judgment standard in § 2254 case where habeas petitioner requested a CPC and a stay of execution).  In determining whether a genuine issue of material fact exists, we consider the facts contained in the summary judgment record and the reasonable inferences drawn from them in the light most favorable to Goodwin, as he is the non-movant.  See id.

## IV.  ANALYSIS

Goodwin posits five arguments for reversal of the district court's judgment denying habeas relief:  (1) Goodwin's appellate counsel rendered unconstitutionally ineffective assistance by failing to raise on appeal the trial court's refusal to give the jury a requested instruction pursuant to article 38.23 of the Texas Code of Criminal Procedure and by failing to provide the Texas Court of Criminal Appeals with a complete transcript of the suppression hearing to review in evaluating Goodwin's direct

8

appeal; (2) he is entitled to an evidentiary hearing on his claim that his confessions were inadmissible at trial because Texas law enforcement officials obtained them in violation of the judicially created rules established to safeguard his Fifth Amendment privilege against compelled self-incrimination; (3) he is entitled to an evidentiary hearing on his claims that the state intentionally withheld from him exculpatory impeachment evidence and knowingly introduced false testimony during trial; (4) he was constitutionally entitled to funds with which to hire a rehabilitation expert to testify at the punishment phase of his trial; and (5) section 8.04(a) of the Texas Penal Code, which prevents voluntary intoxication from serving as a defense to the commission of a crime, unconstitutionally restricted the jury's consideration of evidence of Goodwin's intoxication that would have given him a defense to the specific intent element of capital murder and prohibited the trial court from submitting a constitutionally required lesser-included offense instruction on murder.[2]  We address each of these arguments in turn.

## A. Ineffective Assistance of Counsel on Direct Appeal

Goodwin argues that his appellate counsel rendered unconstitutionally ineffective assistance by (1) failing to raise on appeal the trial court's refusal to grant Goodwin's request to amend the jury instruction given pursuant to article 38.23 of the

---

[2]  Goodwin's federal habeas petition contains a number of claims that Goodwin has not addressed on appeal.  Because Goodwin has abandoned these issues, we do not consider them.  <u>See</u> <u>Brinkmann v. Dallas County Deputy Sheriff Abner</u>, 813 F.2d 744, 748 (5th Cir. 1987).

9

Texas Code of Criminal Procedure and (2) failing to provide the Court of Criminal Appeals with a complete transcript of the pretrial suppression hearing.

A criminal defendant is constitutionally entitled to the effective assistance of counsel on direct appeal as of right. See Lombard v. Lynaugh, 868 F.2d 1475, 1479 (5th Cir. 1989).  In Strickland v. Washington, 466 U.S. 668 (1984), the Supreme Court held that, in order to prove that counsel afforded unconstitutionally ineffective assistance, a petitioner must show that his attorney's performance was deficient and that such deficiency prejudiced the defense.  Id. at 687.  The Strickland standard applies to claims of ineffective assistance by both trial and appellate counsel.  See United States v. Merida, 985 F.2d 198, 202 (5th Cir. 1993).  Goodwin has failed to demonstrate that he received unconstitutionally ineffective assistance of counsel on appeal because he has not demonstrated that any deficiency in his counsel's performance resulted in prejudice.

## 1.  Failure to raise issue on appeal

Goodwin argues that his appellate counsel's performance was both deficient and prejudicial because he failed to raise on appeal the trial court's refusal to instruct the jury pursuant to article 38.23 of the Texas Code of Criminal Procedure that, if it had a reasonable doubt as to the legality of the traffic stop in The Woodlands that led to the arrest of Atkins, Goodwin, Dierr, and Meadows and the seizure of the murder weapon, then it should not consider Goodwin's confessions, which would not have occurred

10

but for the illegal stop.

Article 38.23 of the Texas Code of Criminal Procedure provides in relevant part as follows:

> No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case.
>
> In any case where the legal evidence raises an issue hereunder, the jury shall be instructed that if it believes, or has a reasonable doubt, that the evidence was obtained in violation of the provisions of this Article, then and in such event, the jury shall disregard any such evidence so obtained.

TEX. CRIM. PROC. CODE ANN. art. 38.23 (Vernon Supp. 1998).[3]

The record in this case evinces a fact question bearing upon the legality of the stop. Montgomery County Sheriff's Deputy Daniel Torres, the officer who arrested the occupants of the car in which Goodwin was a passenger, testified at trial that he stopped the car because Atkins, the driver of the car, failed to use a turn signal while leaving the area. Glen Dierr, one of Goodwin's fellow passengers, testified that Atkins used his turn signal. During a search incident to the stop of the car, officers discovered several weapons in the car, including the .357 magnum that was later identified as the weapon used to kill Tillerson.

On January 20, 1987, Texas Ranger Stanley Oldham and Montgomery County Sheriff's Detective Tracy Peterson traveled to

---

[3]  Article 38.23 has been amended since Goodwin's trial, but the amendment did not modify the above language.

11

Burlington, Iowa, where Goodwin and Atkins were in custody on an unrelated matter, to execute a warrant on Atkins regarding the Tillerson murder and to interview the two men. When Peterson and Oldham interviewed Goodwin on January 21, they informed him that they had recovered what appeared to be the murder weapon used to kill Tillerson and that it was the same weapon taken from Atkins's car on December 4.

After hearing this information, Goodwin said, "I'm twenty-three years old and sitting on death row." When Oldham informed him that this was not necessarily true, Goodwin said he knew it would be true because he had pulled the trigger. Peterson and Oldham then obtained a videotaped confession to the murder from Goodwin. Later that day, Oldham and Peterson escorted Goodwin back to Texas, arriving at 9:00 p.m. The next morning, Peterson obtained a written confession from Goodwin.

At trial, the jury received the following instruction regarding its duty to disregard illegally obtained evidence:

> You are instructed that our law provides that no evidence obtained from an accused in violation of the Constitution or laws of this state or of the United States nor evidence derived from the use of such evidence may be considered against him in his trial.
>
> A peace officer may stop and detain a person for any offense committed within his presence or within his view. Failure to signal a turn is an offense. A peace officer may also temporarily detain a person for the purpose of investigating possible criminal behavior when he has specific and articulable facts which, in light of his experience and personal knowledge taken together with rational inferences from those facts, would constitute a reasonable suspicion that some crime has been or is about to be committed. Where the facts relied upon by the police officer in temporarily detaining a person are as consistent with innocent

12

activity as with criminal activity, a detention based on those facts is unlawful.

You are therefore instructed that if you find from the evidence beyond a reasonable doubt, when Deputy Daniel Torres stopped and detained the vehicle and the occupants of the vehicle in which the defendant was a passenger that the driver failed to signal a turn, or that Deputy Torres, at the time of the stop and detention of the vehicle and its occupants, had specific and articulable facts which, in light of his experience and personal knowledge taken together with rational inferences from those facts, would constitute a reasonable suspicion that some crime had been or was about to be committed, then you may consider the weapons and other items seized from said vehicle, and any testimony relating to their seizure, testing by firearms examiners, or identification as the murder weapon.

Unless you so find beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will not consider for any purpose the weapons and other items seized from said vehicle, and any testimony relating to their seizure, testing by firearms examiners, or identification as the murder weapon.

Defense counsel requested that the words "and the confessions of the accused" be added at the end of the last two paragraphs on the ground that any illegality in the underlying search that uncovered the .357 magnum would have tainted Goodwin's confessions. The trial court denied counsel's request.

Goodwin was entitled to an article 38.23 instruction if the trial evidence raised a factual issue concerning whether evidence was obtained in violation of the U.S. Constitution, other federal law, the Texas Constitution, or other Texas law. See TEX. CRIM. PROC. CODE ANN. § 38.23 (Vernon Supp. 1998); Thomas v. State, 723 S.W.2d 696, 707 (Tex. Crim. App. 1986). Because the conflicting trial testimony created a fact issue concerning Torres's right to stop the vehicle, the trial court appropriately

13

granted an article 38.23 instruction with respect to the murder weapon. See Stone v. State, 703 S.W.2d 652, 655 (Tex. Crim. App. 1986) (holding that a fact issue arose concerning a peace officer's right to stop a vehicle due to conflicting testimony between the officer, who stated he stopped the appellant's vehicle for erratic driving, and the testimony of the appellant and another witness that the appellant was driving in a prudent manner). We assume without deciding that Goodwin's confessions were not sufficiently attenuated from the traffic stop so as to render any illegality of the traffic stop irrelevant to the admissibility of the confessions. In other words, we assume without deciding that Goodwin was entitled to an article 38.23 jury instruction regarding his confessions because, in the event that the traffic stop was illegal, the confessions were tainted by such illegality.[4] We likewise assume that the trial court's refusal to provide the requested article 38.23 instruction would have required reversal of Goodwin's conviction on direct appeal

[4] In order to avoid confusion, we note that, under Texas law, the issue of attenuation itself is a question of law. See Bell v. State, 938 S.W.2d 35, 48 (Tex. Crim. App. 1996), cert. denied, 118 S. Ct. 90 (1997). No factual dispute exists regarding events that occurred subsequent to the traffic stop. Therefore no factual dispute exists regarding the facts that would underlie the legal determination of whether Goodwin's confessions were sufficiently attenuated from the traffic stop to render them admissible as evidence even if the traffic stop was illegal. Thus, our assumption that Goodwin was entitled to an article 38.23 instruction regarding his confessions does not rest on an assumption that a fact issue exists as to whether his confessions were sufficiently attenuated from the traffic stop. Rather, we assume that the proper legal conclusion to be drawn from the undisputed post-stop facts is that Goodwin's confessions were not sufficiently attenuated from the stop to render them admissible even if the traffic stop was illegal.

14

and a new trial.[5]

Assuming that the trial court's refusal to provide the requested article 38.23 instruction would have entitled Goodwin to reversal of his conviction on direct appeal, Goodwin nonetheless cannot establish that the failure of his appellate counsel to raise this issue on direct appeal resulted in prejudice.[6]  "The essence of an ineffective assistance claim is

---

[5]  At the time of Goodwin's trial, "the erroneous refusal of a trial judge to submit a jury instruction under article 38.23 over objection of the defendant was considered to require reversal of any ensuing conviction without need of a separate inquiry into the harmfulness of the error."  Atkinson v. State, 923 S.W.2d 21, 25 (Tex. Crim. App. 1996).  However, the Texas Court of Criminal Appeals recently held that the harmless error standard contained in article 36.19 of the Texas Code of Criminal Procedure applies to article 38.23 error.  See id. at 27.  Under article 36.19, the trial court's "judgment shall not be reversed unless the error appearing from the record was calculated to injure the rights of defendant, or unless it appears from the record that the defendant has not had a fair and impartial trial."  TEX. CRIM. PROC. CODE. ANN. art. 36.19 (Vernon 1981).

We determine whether Goodwin has established prejudice based on current law.  See Westley v. Johnson, 83 F.3d 714, 723 (5th Cir. 1996) ("[P]rejudice . . . is measured by current law and not by the law as it existed at the time of the alleged error."); Wilkerson v. Whitley, 28 F.3d 498, 507 (5th Cir. 1994) (en banc) (observing that, on federal habeas review, "[a] state can take advantage of changes in the law occurring after a conviction becomes final").  However, we express no opinion as to whether the trial court's refusal to provide an article 38.23 instruction regarding Goodwin's confessions was harmless error under Texas law, but rather assume for purposes of our analysis that it was not and that the trial court's refusal to provide the requested instruction would therefore mandate reversal on direct appeal.

[6]  Because we conclude that Goodwin has not established the prejudice prong of Strickland's test for ineffective assistance of counsel, we need not address whether his appellate counsel's performance was constitutionally deficient.  As the Supreme Court observed in Strickland,

> Although we have discussed the performance
> component of an ineffectiveness claim prior to the

15

that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect."  Kimmelman v. Morrison, 477 U.S. 365, 374 (1986).  We are convinced that the trial court's failure to provide the jury with an article 38.23 instruction regarding Goodwin's confessions in no way rendered the trial unfair or the verdict suspect.  As such, the failure of Goodwin's appellate counsel to present this issue on direct appeal was not prejudicial because it did not "undermine[] the reliability of the result of the proceeding."  Strickland, 466 U.S. at 693.

Prior to trial, Goodwin moved to suppress his confessions on the ground that they were tainted by the illegal stop and search of Atkins's automobile in The Woodlands.  He based this motion in part on the argument that Atkins had not failed to use his turn signal and thus that no basis existed for the stop.  The state district court denied the motion to suppress and specifically found that Atkins had not used his turn signal.  Because Goodwin alleges no defect in this fact-finding or the procedure used at

> prejudice component, there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one.  In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance.

Strickland, 466 U.S. at 697; see also United States v. Vaquero, 997 F.2d 78, 92 n.12 (5th Cir. 1993).

16

the suppression hearing to obtain it, we accord the court's conclusion that Atkins did not use his blinker a presumption of correctness.  See 28 U.S.C. § 2254(d)(1994);[7] Harris, 81 F.3d at 539.

Goodwin has not argued that any factual issues other than the issue of whether Atkins used his turn signal bear upon the legality of the traffic stop and the subsequent search that resulted in the discovery and seizure of the murder weapon. Goodwin does not dispute that the traffic stop was perfectly legal if in fact Atkins failed to use his blinker, nor can he do so.  So long as a traffic law infraction that would have objectively justified the stop had taken place, the fact that the police officer may have made the stop for a reason other than the occurrence of the traffic infraction is irrelevant for purposes of the Fourth Amendment and comparable Texas law.  See Whren v. United States, 116 S. Ct. 1769, 1774 (1996) (concluding that a "pretextual" traffic stop for a minor traffic infraction was constitutional because "'the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action'" (quoting Scott v. United States, 436 U.S. 128, 138 (1978))); Crittenden v. State, 899

---

[7]  Because Goodwin filed his habeas petition before April 24, 1996, we apply the pre-AEDPA version of § 2254(d).  See Lindh v. Murphy, 117 S. Ct. 2059, 2067-68 (1997); Williams v. Cain, 125 F.3d 269, 273 (5th Cir. 1997).

17

S.W.2d 668, 674 (Tex. Crim. App. 1995) ("[A]n objectively valid traffic stop is not unlawful under Article I, § 9 [of the Texas Constitution, a provision analogous to the Fourth Amendment of the U.S. Constitution], just because the detaining officer had some ulterior motive for making it.").  Because the state district court concluded that the state established by a preponderance of the evidence that Atkins did not use his blinker,[8] the introduction of Goodwin's confessions was fully consistent with the Fourth Amendment exclusionary rule.  See United States v. Chavis, 48 F.3d 871, 872 (5th Cir. 1995) (holding that the state bears the burden of proving that a warrantless stop and search is reasonable in order for evidence obtained therefrom to be admissible); United States v. Finefrock, 668 F.2d 1168, 1170 (10th Cir. 1982) (holding that the government must prove the reasonableness of a warrantless search or seizure by a preponderance of the evidence); United States v. Collins, 863 F. Supp. 165, 169 n.2 (S.D.N.Y. 1994) ("[T]he government must show by a preponderance of the evidence that the warrantless search does not contravene the Fourth Amendment."); cf. United States v. Matlock, 415 U.S. 164, 178 n.14 (1974) ("[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the

_____

[8]  Under Texas law, when a party challenging the propriety of a warrantless search or seizure produces evidence that police conducted such a search or seizure, the state bears the burden of proving the reasonableness of the search or seizure by a preponderance of the evidence.  See Russel v. State, 717 S.W.2d 7, 10 (Tex. Crim. App. 1986); Chavarria v. State, 876 S.W.2d 388, 392 (Tex. App.--El Paso 1994, no pet.).

18

evidence.").

We simply cannot conclude that the trial court's failure to give the jury an opportunity to wholly disregard the confessions if it believed, or had a reasonable doubt, that they were obtained unlawfully--after the court had in effect found during the pretrial suppression hearing by a preponderance of the evidence that the confessions were obtained in compliance with the Fourth Amendment and analogous Texas law--rendered "the result of the trial unreliable or the proceeding fundamentally unfair." Lockhart v. Fretwell, 506 U.S. 364, 372 (1993). Indeed, had the trial court given the requested article 38.23 instruction in this case, the reliability of the trial may very well have decreased. As the Supreme Court noted in Stone v. Powell, 428 U.S. 465 (1976), application of the Fourth Amendment exclusionary rule "deflects the truthfinding process and often frees the guilty" by excluding "reliable and . . . probative information bearing on the guilt or innocence of the defendant." Id. at 490. The Texas exclusionary rule has an even greater propensity for deflecting the truthfinding process of the trial when applied to evidence arguably obtained through an illegal search or seizure because it requires the jury to disregard such evidence, regardless of how probative, if the jury "believes, or has a reasonable doubt, that the evidence" was unlawfully obtained. TEX. CRIM. PROC. CODE ANN. § 38.23(a) (Vernon Supp. 1998). Thus, the failure of Goodwin's appellate counsel to raise this issue on appeal was not unconstitutionally prejudicial.

19

Goodwin contends that he has established Strickland prejudice if "there is a 'reasonable probability' that the omitted article 38.23 instruction claim would have caused a reversal on direct appeal had it been raised by [his] appellate counsel." We disagree.

As an initial matter, the Supreme Court has indicated that "an analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective." Fretwell, 506 U.S. at 369. Furthermore, the law of the Supreme Court and this circuit lead us to conclude that the presence or absence of prejudice, both with respect to claims of ineffective assistance of counsel at the trial and appellate levels, hinges upon the fairness of the trial and the reliability of the judgment of conviction resulting therefrom.

In Evitts v. Lucey, 469 U.S. 387 (1985), the Supreme Court indicated that a criminal defendant's right to effective assistance of counsel on his first appeal as of right stems from the fact that, when a state chooses to create appellate courts, appellate review becomes "'an integral part of the . . . system for finally adjudicating the guilt or innocence of a defendant.'" Id. at 393 (quoting Griffin v. Illinois, 351 U.S. 12, 18 (1956)). The appellate process exists solely for the purpose of correcting errors that occurred at the trial court level. See id. at 396 ("In bringing an appeal as of right from his conviction, a criminal defendant is attempting to demonstrate that the

20

conviction, with its consequent drastic loss of liberty, is unlawful."). As such, we conclude that the right to effective assistance of counsel, both at the trial and appellate level, "'is recognized not for its own sake, but because of the effect that it has on the ability of the accused to receive a fair trial.'" Fretwell, 506 U.S. at 369 (quoting United States v. Cronic, 466 U.S. 648, 658 (1984)).

This court's decision in Ricalday v. Procunier, 736 F.2d 203 (5th Cir. 1984), supports our conclusion that the presence or absence of Strickland prejudice as a result of unconstitutionally deficient performance of counsel at either the trial or appellate level hinges upon the fairness of the trial and the reliability of its outcome. In Ricalday, the habeas petitioner's counsel failed to object to the trial court's instruction of the jury regarding an unindicted offense and did not raise this issue on appeal. See id. at 205. Pursuant to the Texas Penal Code's definition of the offense of murder, the trial court instructed the jury that it could convict the petitioner of murder either if he "'intentionally or knowingly cause[d] the death of an individual'" or if he "'intend[ed] to cause serious bodily injury and commit[ed] an act clearly dangerous to human life that cause[d] the death of an individual.'" Id. (quoting TEX. PEN. CODE ANN. § 19.02 (Vernon 1974)). However, the indictment only charged the petitioner with "intentionally or knowingly caus[ing] the death of an individual." Id. (alteration in original). Under Texas law, conviction of an unindicted offense constituted

21

"fundamental" error requiring reversal.  See id. at 207 (citing Bentacur v. State, 593 S.W.2d 686 (Tex. Crim. App. 1980)).

The court concluded that the failure of the petitioner's counsel to object to the trial court's inclusion of the unindicted offense in the jury charge was not prejudicial because there was "no reasonable probability that the factfinder would have had a reasonable doubt concerning the petitioner's intent to kill."  Id. at 209.  The court then rejected the habeas petitioner's claim of ineffective assistance of appellate counsel:  "Because the error at the appellate stage stemmed from the error at trial, if there was no prejudice from the trial error, there was also no prejudice from the appellate error."  Id. at 208.  The court therefore concluded "that the proceedings were not fundamentally unfair and that their result, and the finding of guilt, are reliable."  Id. at 209 n.6 (emphasis added).  We have applied Ricalday's sound analysis in other cases as well.  See McCrae v. Blackburn, 793 F.2d 684, 688 (5th Cir. 1986) (concluding that appellate counsel's failure to raise an issue on appeal was not prejudicial because the petitioner could not demonstrate a reasonable probability that raising the issue would have ultimately resulted in the trial court's imposition of a different sentence); Hamilton v. McCotter, 772 F.2d 171, 182 (5th Cir. 1985) (rejecting a claim of ineffective assistance of appellate counsel because "the state record reflect[ed] that the proceedings were fundamentally fair, that their result and the finding of guilt are reliable, and that no breakdown of the

22

adversarial process rendered them otherwise" (emphasis added)).[9]

Goodwin relies on Duhamel v. Collins, 955 F.2d 962 (5th Cir. 1992) for the proposition that, "[i]n order to prove that his appellate attorney's alleged error was prejudicial, [a federal habeas petitioner] must show that the neglected claim would have had a reasonable probability of success on appeal." Id. at 967. While Goodwin does not rely upon it, we acknowledge that, in another Fifth Circuit case, Sharp v. Puckett, 930 F.2d 450 (5th Cir. 1991), the court utilized a similar prejudice analysis in disposing of a habeas petitioner's claim of ineffective assistance of appellate counsel. See id. at 453 ("'The

_____

[9] We note also that acceptance of Goodwin's position that the prejudice inquiry with respect to a claim of ineffective assistance of appellate counsel hinges solely on whether the neglected claim had a reasonable probability of leading to a different result on appeal would lead to the anomalous result that a habeas petitioner would be able to establish prejudice for deficient performance of appellate counsel in circumstances in which he could not do so for functionally equivalent deficient performance by trial counsel. This is clearly illustrated by applying Goodwin's proposed prejudice paradigm to the Ricalday factual scenario. Had the petitioner's counsel simply failed to object to the jury's charge regarding the unindicted offense, the petitioner would not have been prejudiced because it was highly unlikely that the jury would not have convicted him of murder anyway, i.e., the result of the trial would have been the same. However, if the petitioner's counsel had objected at trial but merely failed to raise the issue on appeal, under Goodwin's approach to the prejudice inquiry, the petitioner would have established prejudice because, had the issue been raised on appeal, the court of appeals would have been compelled to reverse and remand, i.e., the result on appeal would have been different. This result cannot be squared with the fact that the deficient performance of trial counsel and the deficient performance of appellate counsel described above are functionally equivalent in their effect on the petitioner: they both preclude review of the petitioner's claim on direct appeal. We therefore cannot accept Goodwin's position that a habeas petitioner ought to be entitled to habeas relief in the latter circumstance but not the former.

23

[petitioner] must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the [appeal] would have been different." (quoting <u>Strickland</u>, 466 U.S. at 694) (alterations in original)).  We note as an initial matter that <u>Duhamel</u> and <u>Sharp</u>'s focus on the outcome of the appeal is inconsistent with the analysis advanced in <u>Ricalday</u>. We are therefore bound to follow <u>Ricalday</u>, an earlier panel decision, because "[i]t has long been a rule of this court that no panel of this circuit can overrule a decision previously made by another."  <u>Ryals v. Estelle</u>, 661 F.2d 904, 906 (5th Cir. Nov. 1981)

Additionally, <u>Duhamel</u> and <u>Sharp</u> are both pre-<u>Fretwell</u> decisions.  <u>Fretwell</u> makes clear that their limited focus on "mere outcome determination" at the appellate level is "defective."  <u>Fretwell</u>, 506 U.S. at 369.  <u>Fretwell</u> indicates that we must determine the presence or absence of prejudice based upon the fairness of the proceeding and the reliability of its result. See <u>id.</u> at 369.  To the extent that the appellate process is merely a vehicle for correcting errors at trial, the fairness and reliability of an appeal are necessarily functions of the fairness and reliability of the trial.  Because the trial court's refusal to provide the jury with an article 38.23 instruction regarding his confessions did not render Goodwin's trial fundamentally unfair nor the conviction and sentence resulting therefrom unreliable, Goodwin was not prejudiced by his appellate counsel's failure to raise this issue on appeal.  Therefore, the

district court properly concluded that he is not entitled to habeas relief on this claim.

## 2. Failure to provide entire record to appellate court

Goodwin argues that he was denied a meaningful appeal due to his appellate counsel's failure to provide the Texas Court of Criminal Appeals with a full transcript of his pretrial suppression hearing to review on direct appeal. Goodwin's appellate counsel apparently neglected to have two days of the suppression hearing transcribed and therefore did not supply the Court of Criminal Appeals with a complete transcript of the suppression hearing. The missing portion of the transcript contained the testimony of Atkins and Dierr indicating that Atkins had used his turn signal prior to the traffic stop in The Woodlands.

Goodwin contends that his appellate counsel's failure to submit a complete transcript of the pretrial suppression hearing violated his right to effective assistance of appellate counsel because the Court of Criminal Appeals was thereby precluded from reviewing all of the evidence pertaining to the legality of the traffic stop and the propriety of the trial court's denial of Goodwin's motion to suppress. We disagree.

Under Texas law, the trial court is the sole fact-finder and judge of the credibility of the witnesses as well as the weight to be given their testimony at a hearing on a motion to suppress. See Romero v. State, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990); Hawkins v. State, 628 S.W.2d 71, 75 (Tex. Crim. App. 1982).

25

Accordingly, the trial court may choose to believe or disbelieve any or all of a witness's testimony.  See Luckett v. State, 586 S.W.2d 524, 527 (Tex. Crim. App. 1979).  On appeal, the Court of Criminal Appeals cannot disturb the trial court's findings so long as they are supported by the record.  See Green v. State, 615 S.W.2d 700, 707 (Tex. Crim. App. 1980).  If the Court of Criminal Appeals concludes that the record supports the trial court's factual conclusions, its review is limited to a determination of "whether the trial court improperly applied the facts to the law."  Johnson v. State, 698 S.W.2d 154, 159 (Tex. Crim. App. 1985).

Even if the Court of Criminal Appeals had been privy to the testimony of Atkins and Dierr, it would have been compelled to accept the trial court's determination that Atkins failed to use his blinker because the record contained Officer Torres's testimony to that effect.  The fact that the Court of Criminal Appeals might have considered the testimony of Atkins and Dierr more credible than that of Officer Torres would have been entirely irrelevant to the court's review of the trial court's denial of the motion to suppress.  See Green, 615 S.W.2d at 707; Luckett, 586 S.W.2d at 527.  Goodwin therefore cannot establish that his appellate counsel's failure to provide the Court of Criminal Appeals with a full transcript of the suppression hearing in any way prejudiced him.  Accordingly, he has not demonstrated that he is entitled to habeas relief on this basis.

See Strickland, 466 U.S. at 687.[10]

### B. Violation of Judicially Created Safeguards of the Fifth Amendment Privilege Against Self-Incrimination

Goodwin argues that the district court erred by failing to conduct an evidentiary hearing on his claim that the admission of his confessions as evidence at trial violated the judicially created rules established to safeguard his Fifth Amendment privilege against compelled self-incrimination. In support of

---

[10] Goodwin contends that the Strickland ineffective assistance framework is inapplicable to this particular claim of ineffective assistance because he is entitled to a presumption of prejudice pursuant to United States v. Cronic, 466 U.S. 648 (1984). He argues that, because his appellate counsel never had two days worth of testimony in the suppression hearing transcribed, his counsel did not have access to this portion of the transcript and therefore did not review it in preparing Goodwin's appeal. Goodwin argues that his "direct appeal lawyer's failure to have a material portion of [the] suppression hearing transcribed--and, by doing so, his failure to read all of the relevant portions of the trial record in support of a claim raised on appeal--is tantamount to being 'absent' at trial." This argument lacks merit.

Cronic-type prejudice results in circumstances in which, although counsel is present, counsel's ineffectiveness is so egregious that the defendant is in effect denied any meaningful assistance of counsel at all. See Childress v. Johnson, 103 F.3d 1221, 1229 (5th Cir. 1997). When the defendant receives at least some meaningful assistance, he must prove prejudice in order to obtain relief for ineffective assistance of counsel. Id.

Goodwin cannot complain of a lack of meaningful assistance on appeal and therefore is not entitled to a presumption of prejudice. His lawyer filed an appeal and advanced cogent arguments. The failure of Goodwin's appellate counsel to read two days of the trial record falls far short of establishing that any deficiency in his performance precluded meaningful appellate review entirely or in effect constituted no assistance of appellate counsel at all. See Hamilton, 772 F.2d at 181-82. Therefore, in order to establish a claim of ineffective assistance of counsel, Goodwin must prove that his appellate counsel's failure to provide the Court of Criminal Appeals with a full transcript of the suppression hearing prejudiced him. See id. at 182. As demonstrated above, he cannot do so.

his claim, Goodwin offers his affidavit, which states that, shortly after he was arrested in Burlington, Iowa, Goodwin told police that he did not wish to answer any questions in the absence of counsel. Goodwin contends that his confessions were therefore inadmissible at trial because they are the product of interrogation initiated by Texas law enforcement officials after Goodwin's request for the assistance of counsel during custodial interrogation.

## 1. Exhaustion of state remedies and procedural default doctrine

The district court appears to have based its denial of this portion of Goodwin's petition for habeas relief on its belief that Goodwin did not assert the claim in state court. The district court's opinion states the following:

> This is not a proper complaint for habeas corpus review. Goodwin's affidavit comes seven years after the incident. He was uniquely aware of the alleged mistreatment before trial and should have informed his attorney then. This issue could have been litigated at the trial and is, therefore, inappropriate to raise here for the first time.

The district court mistakenly concluded that Goodwin asserted his current Fifth Amendment claim for the first time in his federal habeas petition. Goodwin presented the Fifth Amendment argument that he now asserts for the first time in his second state habeas petition. Therefore, he has not failed to exhaust his state remedies with respect to this claim, and the state conceded as much at the district court level. See Nobles v. Johnson, 127 F.3d 409, 420 (5th Cir. 1997) ("To have exhausted his state remedies, a habeas petitioner must have fairly

28

presented the substance of his claim to the state courts."). Moreover, the state has not argued, either at the district court level or on appeal, that Goodwin's Fifth Amendment claim is procedurally barred on the basis that he failed to present the claim until his second state habeas petition or on any other basis. In its response to Goodwin's second state habeas petition, the state likewise did not argue that Goodwin had procedurally defaulted his claim by failing to assert it earlier.[11] Given that the state has not seen fit to argue in this court, the district court, or even its own courts that Goodwin's Fifth Amendment claim is procedurally defaulted, we would advance no interest in federalism or comity by raising the issue ourselves. We therefore decline to do so and proceed to the merits of Goodwin's Fifth Amendment claim. See Trest v. Cain, 118 S.Ct. 478, 480 (1997) (holding that a court of appeals reviewing a district court's habeas corpus decision is not required to raise sua sponte the petitioner's potential procedural default).

**2. Goodwin's entitlement to an evidentiary hearing**

"When there is a 'factual dispute, [that,] if resolved in the petitioner's favor, would entitle [her] to relief and the

_____

[11] To the contrary, the state argued that Goodwin's Fifth Amendment claim should be denied because the substance of the claim was presented to, and rejected by, the Texas Court of Criminal Appeals on direct appeal. The state based this argument on the fact that Goodwin had challenged the admissibility of his confessions on direct appeal, albeit on the basis of a constitutional analysis entirely different from that advanced here and in his second state habeas petition.

29

state has not afforded the petitioner a full and fair evidentiary hearing,' a federal habeas corpus petitioner is entitled to discovery and an evidentiary hearing."  <u>Perillo v. Johnson</u>, 79 F.3d 441, 444 (5th Cir. 1996) (quoting <u>Ward v. Whitley</u>, 21 F.3d 1355, 1367 (5th Cir. 1994)) (alterations in original).

We conclude that Goodwin has satisfied the above standard and is therefore entitled to an evidentiary hearing to resolve the factual issue of whether Goodwin informed the Burlington police upon being taken to the Burlington police station that he did not wish to be interrogated in the absence of counsel.  If Goodwin so informed the Burlington police, then his confessions later obtained through interrogation initiated by Texas law enforcement officers were inadmissible on Fifth Amendment grounds, and the admission of those confessions was not harmless error.  We further conclude that the fact-finding procedure utilized by the state district court in resolving this factual issue was inadequate to afford Goodwin a full and fair hearing.  As such, Goodwin is entitled to an evidentiary hearing on his Fifth Amendment claim.

### a.  Fifth Amendment law

The Fifth Amendment guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."  U.S. CONST. amend. V.  The Fifth Amendment privilege against self-incrimination is "protected by the Fourteenth Amendment against abridgment by the States."  <u>Malloy v. Hogan</u>, 378 U.S. 1, 6 (1964).  In <u>Miranda v. Arizona</u>, 384 U.S. 436

30

(1966), the Supreme Court observed that "the right to have counsel present . . . [during custodial] interrogation is indispensable to the protection of the Fifth Amendment privilege." Id. at 469. In order to fully safeguard the privilege, the Court held that, "[i]f the individual [under interrogation] states that he wants an attorney, the interrogation must cease until an attorney is present." Id. at 474.

As a corollary to the prophylactic rule adopted in Miranda, the Court held in Edwards v. Arizona, 451 U.S. 477 (1981), that, once the accused asserts this Fifth Amendment right to counsel[12] and thereby "expresse[s] his desire to deal with the police only through counsel, [he] is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." Id. at 484-85; see also United States v. Carpenter, 963 F.2d 736, 739 (5th Cir. 1992). "If the police do subsequently initiate an encounter in

_____

[12] We note for the sake of clarity that the term "Fifth Amendment right to counsel" is something of a misnomer to the extent that it indicates that the Fifth Amendment itself creates a right to counsel. The rights created by Miranda, including the right to have counsel present during custodial interrogation, "are 'not themselves rights protected by the Constitution but [are] instead measures to insure that the right against compulsory self-incrimination [is] protected.'" Duckworth v. Eagan, 492 U.S. 195, 203 (1989) (quoting Michigan v. Tucker, 417 U.S. 433, 444 (1974)) (alterations in original); United States v. Smith, 7 F.3d 1164, 1170 (5th Cir. 1993). However, because of the pervasiveness of the term's use in the cases of the Supreme Court and this circuit interpreting the right to counsel created by Miranda, we use it here.

the absence of counsel (assuming there has been no break in custody), the suspect's statements are presumed involuntary and therefore inadmissible as substantive evidence at trial, even where the suspect executes a waiver and his statements would be considered voluntary under traditional standards." McNeil v. Wisconsin, 501 U.S. 171, 177 (1991).

In Arizona v. Roberson, 486 U.S. 675 (1988), the Court made clear that the Edwards rule is not offense specific.[13] See id. at 682-84; see also McNeil, 501 U.S. at 177; Carpenter, 963 F.2d at 739. Once a suspect invokes his Fifth Amendment right to counsel with respect to one offense, law enforcement officials may not reapproach him regarding any offense unless counsel is present. See McNeil, 501 U.S. at 177; Roberson, 486 U.S. at 682-84, 687; Carpenter, 963 F.2d at 739; United States v. Cooper, 949 F.2d 737, 741 (5th Cir. 1991). This is true even when different law enforcement authorities who may be unaware of the suspect's prior invocation of his Fifth Amendment right to counsel reapproach the suspect regarding a different offense. See Roberson, 486 U.S. at 687 ("[W]e attach no significance to the

---

[13]   Roberson announced a new rule of constitutional law that cannot be invoked by a state habeas petitioner whose conviction became final before 1988. See Harriman v. Lynn, 901 F.2d 64, 67 (5th Cir. 1990) (citing Butler v. McKellar, 494 U.S. 407 (1990)). However, Goodwin's conviction did not become final until 1991, when the Supreme Court denied his application for a writ of certiorari. See Caspari v. Bohlen, 510 U.S. 383, 390 (1994) (holding that a state conviction becomes final for purposes of retroactivity analysis when the availability of direct appeal to state courts has been exhausted and the time for filing a petition for writ of certiorari has elapsed or a timely petition has been finally denied). Therefore, Roberson is applicable in resolving Goodwin's Fifth Amendment claim.

32

fact that the officer who conducted the second interrogation did not know that respondent had made a request for counsel."); Minnick v. Mississippi, 498 U.S. 146, 148-49, 155 (1990) (holding that statements of the petitioner derived from reinitiation of custodial interrogation by a county deputy sheriff were inadmissible because the petitioner had previously invoked his Fifth Amendment right to counsel during interrogation by FBI agents); Cooper, 949 F.2d at 741 ("Because the Fifth Amendment right is not offense specific, the Edwards rule applies even when the interrogation is based on different offenses or is conducted by different law enforcement authorities."); cf. United States v. Webb, 755 F.2d 382, 389-90 (5th Cir. 1985) (holding that FBI agents obtained the defendant's confession in violation of Edwards where the defendant had previously invoked his right to counsel and a state official erroneously informed the FBI that the defendant had on his own initiative requested the opportunity to make a statement to FBI agents).

Proper application of the above legal principles to Goodwin's Fifth Amendment claim requires a synopsis of the factual circumstances surrounding the confessions that Goodwin made at the behest of Texas law enforcement officers. On January 17, 1987, Goodwin was arrested in Burlington, Iowa for first degree burglary and going armed with intent.[14] Burlington police

---

[14] On the same day, an information was filed charging Goodwin with first degree burglary, and Goodwin appeared before an Iowa magistrate. During this appearance, Goodwin requested the appointment of counsel, and the magistrate granted this request. Goodwin contends that, by requesting the appointment of

33

counsel before the Iowa magistrate, he invoked his Fifth Amendment right to have counsel present during police interrogation on any offense.  We disagree.

When Goodwin appeared before the Iowa magistrate, his Sixth Amendment right to counsel had attached with respect to the charge of first degree burglary.  See Cooper, 949 F.2d at 741 n.1 ("The Sixth Amendment right to counsel attaches 'at or after the initiation of adversary judicial criminal proceedings--whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" (quoting Kirby v. Illinois, 406 U.S. 682, 689 (1972))).  The record before us indicates that Goodwin's request for counsel before the Iowa magistrate constituted nothing more than the invocation of his Sixth Amendment right to counsel with respect to the burglary charge.

The Supreme Court held in McNeil v. Wisconsin, 501 U.S. 171 (1991), that, as a matter of fact and policy, the invocation of the offense-specific Sixth Amendment right to counsel does not of itself constitute the invocation of the non-offense specific Fifth Amendment right to counsel.  See id. at 177.  Rather, invocation of the Fifth Amendment right to counsel occurs only when the accused "'ha[s] expressed' his wish for the particular sort of lawyerly assistance that is the subject of Miranda."  Id. at 178 (quoting Edwards, 451 U.S. at 484) (alteration in original); Cooper, 949 F.2d at 742.  Moreover, it is questionable whether an individual can anticipatorily invoke his Fifth Amendment right to counsel at an arraignment or other hearing at which he is not subject to custodial interrogation.  As the Court observed in McNeil,

> We have in fact never held that a person can invoke his Miranda rights anticipatorily, in a context other than "custodial interrogation"--which a preliminary hearing will not always, or even usually, involve.  If the Miranda right to counsel can be invoked at a preliminary hearing, it could be argued, there is no logical reason why it could not be invoked by a letter prior to arrest, or indeed even prior to identification as a suspect.  Most rights must be asserted when the government seeks to take the action they protect against.  The fact that we have allowed the Miranda right to counsel, once asserted, to be effective with respect to future custodial interrogation does not necessarily mean that we will allow it to be asserted initially outside the context of custodial interrogation, with similar future effect.

McNeil, 501 U.S. at 182 n.3 (citations omitted).  However, we need not resolve the issue of whether anticipatory invocation of

34

officers took Goodwin to the Burlington police station, where he

was held in custody through January 21.  On January 21, Texas law

enforcement officials interviewed Goodwin.  During the interview,

Goodwin signed a waiver of rights form, and subsequently provided

<hr />

Miranda rights outside the context of custodial interrogation is
possible here. Because the record in this case is devoid of any
indication that Goodwin's request for counsel before the Iowa
magistrate included a "request that counsel represent him in
unrelated future custodial interrogations," we conclude that this
request for counsel did not constitute an invocation of Goodwin's
Fifth Amendment right to counsel.  Cooper, 949 F.2d at 742.

    Goodwin argues that Rule 2(2) of the Iowa Code of Criminal
Procedure, pursuant to which the magistrate admonished Goodwin
prior to his request for counsel, is similar to article 15.17 of
the Texas Code of Criminal Procedure, the statutory provision
that dictates the information with which a magistrate must
provide an accused person in a similar proceeding in Texas.
Compare TEX. CRIM. PROC. CODE ANN. art. 15.17 (Vernon Supp. 1998)
with IOWA CODE ANN. § 813.2 (1994).  Goodwin contends that Texas
courts have concluded that an accused's invocation of the right
to counsel at an article 15.17 hearing necessarily constitutes an
invocation of the accused's Fifth Amendment right to counsel.
However, none of the authority cited by Goodwin stands for this
proposition.  See Green v. State, 872 S.W.2d 717, 726 (Tex. Crim.
App. 1994) (Baird, J., concurring); Young v. State, 820 S.W.2d
180, 187 (Tex. App.--Dallas 1991, pet. ref'd) (noting that the
state conceded that the defendant invoked his Fifth Amendment
right to counsel at an article 15.17 hearing); Higginbotham v.
State, 769 S.W.2d 265, 269 (Tex. App.--Houston [14th Dist.] 1989)
(holding that a defendant's request for counsel during an article
15.17 hearing that took place prior to the attachment of the
accused's Sixth Amendment right to counsel served to invoke the
accused's Fifth Amendment right to counsel), rev'd on other
grounds 807 S.W.2d 732 (Tex. Crim. App. 1991).  In fact, the
Texas Court of Criminal Appeals has expressly held to the
contrary.  See Green v. State, 934 S.W.2d 92, 97 (Tex. Crim. App.
1996) (holding that the appellant's request for counsel at a
preliminary hearing before a magistrate did not serve to invoke
his Fifth Amendment right to counsel because the appellant was
not subjected to custodial interrogation during the hearing),
cert. denied, 117 S. Ct. 1561 (1997).  While we are not bound to
accept the conclusions of the Court of Criminal Appeals regarding
when a federal right attaches within the context of Texas's
criminal procedural framework, we find the court's conclusion
consistent with pertinent federal precedent.  See McNeil, 501
U.S. at 177, 182 n.3; Cooper, 949 F.2d at 742.

35

the Texas law enforcement authorities with a videotaped confession.  That evening, Goodwin flew back to Texas in the custody of Texas law enforcement officials.  The next morning, Texas law enforcement officials brought Goodwin before a magistrate who issued a magistrate's warning and set Goodwin's bond.  A law enforcement officer later read Goodwin his rights again, and Goodwin again agreed to waive them.  He then provided a written confession.  He also made incriminating oral statements identifying the bayonet stolen from Tillerson and the gun used by Atkins during the robbery and murder.

Goodwin contends that he invoked his Fifth Amendment right to counsel following his arrest in Burlington.  In support of this contention, he offers his own affidavit, which he submitted along with his federal habeas petition and his second state habeas petition.  Goodwin's affidavit states that, shortly after his arrest, a Burlington police officer asked Goodwin to sign a form waiving his Miranda rights.  According to his affidavit, Goodwin refused to do so and informed the officer that he did not wish to answer any questions outside the presence of an attorney.  If what Goodwin states in his affidavit is true, his subsequent purported waivers of this Fifth Amendment right to counsel prior to interrogation by Texas authorities were presumptively invalid even though the Texas authorities informed Goodwin of his Miranda rights prior to each waiver, and his confessions would be inadmissible on this basis.  See Roberson, 486 U.S. at 682-84, 687; United States v. Cruz, 22 F.3d 96, 98 (5th Cir. 1994) ("'[A]

36

valid waiver of that right [to have counsel present during custodial interrogation] cannot be established by showing only that [the accused] responded to further police-initiated custodial interrogation even if [the accused] has been advised of his rights.'" (quoting Edwards, 451 U.S. at 484)) (all alterations except second in original).

### b. Harmless error

Although admission of Goodwin's confessions constituted constitutional error under the factual scenario advanced by Goodwin, such error cannot provide a ground for habeas relief, and thus cannot provide a basis for an evidentiary hearing, if the error was harmless. See Brecht v. Abrahamson, 507 U.S. 619, 622-23 (1993) (observing that habeas relief need not be granted when constitutional error is harmless); Perillo, 79 F.3d at 444 (noting that an evidentiary hearing is required only if the petitioner establishes the existence of "a factual dispute, that, if resolved in the petitioner's favor, would entitle her to relief" (internal quotation marks and brackets omitted)).

The Supreme Court has held that "trial error"--that is, error that "'occur[s] during the presentation of the case to the jury'"--"is amenable to harmless-error analysis because it 'may . . . be quantitatively assessed in the context of other evidence presented in order to determine [the effect it had on the trial].'" See Brecht, 507 U.S. at 629 (quoting Arizona v. Fulminante, 499 U.S. 279, 307-08 (1991)) (alterations in original). The admission of confessions obtained in violation of

Edwards and its progeny constitutes trial error, and is therefore amenable to harmless error analysis. See United States v. Cannon, 981 F.2d 785, 789 n.3 (5th Cir. 1993) ("A harmless-error analysis may be performed to examine the effect of an Edwards violation."); United States v. Webb, 755 F.2d 382, 392 (5th Cir. 1985) (applying harmless-error analysis to statements admitted in violation of Edwards).

The harmless-error standard applicable in conducting habeas review requires the granting of habeas relief on the basis of constitutional trial error only if the error "'had substantial and injurious effect or influence in determining the jury's verdict.'" Brecht, 507 U.S. at 620 (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)).

If in fact Goodwin invoked his Fifth Amendment right to counsel upon his arrival at the Burlington police station, then the state district court improperly admitted Goodwin's videotaped confession, his written confession, and his incriminating statements identifying the bayonet stolen from Tillerson and the gun used by Atkins during the robbery and murder. We are convinced that the admission of this evidence, if improper, "had substantial and injurious effect or influence in determining the jury's verdict." Id. at 623 (internal quotation marks omitted).

While the state presented a substantial amount of other evidence against Goodwin, including the testimony of Dierr that Goodwin told him that he shot someone in the woods and ammunition found at the site of Goodwin's confession to Dierr that was fired

38

from the murder weapon, Goodwin's statements doubtless had a tremendous impact on the jury. Goodwin's written confession lengthily recounts how he and Atkins held Tillerson at gunpoint while they searched Tillerson's trailer for money, how they began taking items from the trailer, how they drank all of Tillerson's beer while they were there, how they made Tillerson get dressed and go with them in Atkins's car to the woods, and how Goodwin killed Tillerson. Goodwin's videotaped confession contains similar factual detail. Moreover, Goodwin's statements identifying the weapon used by Atkins and the bayonet stolen from Tillerson are highly probative of his guilt.

"A confession is like no other evidence." Fulminante, 499 U.S. at 296. It "is probably the most probative and damaging evidence that can be admitted against [a criminal defendant]." Bruton v. United States, 391 U.S. 123, 139 (1968) (White, J., dissenting). "While some statements by a defendant may concern isolated aspects of the crime or may be incriminating only when linked to other evidence, a full confession in which the defendant discloses the motive for and means of the crime may tempt the jury to rely upon that evidence alone in reaching its decision." Fulminante, 499 U.S. at 296. The possibility that the jury focused solely on Goodwin's confessions in this case is enhanced by the fact that the prosecution stated in closing argument that Goodwin's confessions were the "only evidence" that Goodwin killed Tillerson "in the course of committing kidnapping [or] robbery," a fact that the state had to prove beyond a

39

reasonable doubt in order to support Goodwin's conviction for capital murder.  See TEX. PEN. CODE ANN. § 19.03(a)(2) (Vernon 1994).  We therefore cannot say that the state district court's admission of Goodwin's two confessions, coupled with its admission of his other highly incriminating statements of identification, constituted harmless error.

Because any error the state district court committed in admitting Goodwin's confessions and other incriminating statements was not harmless, Goodwin has established the existence of a fact issue that, if resolved in his favor, would entitle him to habeas relief.[15]  We turn now to the issue of

---

[15]  In concluding that Goodwin is not entitled to an evidentiary hearing on his Fifth Amendment claim, the federal district court acknowledged that Goodwin's affidavit stated that he requested counsel upon being taken to the Burlington police station but apparently based its decision denying Goodwin's request for an evidentiary hearing on its conclusion that the other evidence in the record did not support this contention. The presence of conflicting evidence, however, even if substantially weighted in favor of the state, generally denotes the existence of a genuine fact question requiring an evidentiary hearing.  The only exception is where the petitioner's evidence is limited to "'conclusory allegations unsupported by specifics'" or "'contentions that in the face of the record are wholly incredible.'"  Perillo, 79 F.3d at 444 (quoting Blackledge v. Allison, 431 U.S. 63, 74 (1977)).  This is not such a case.

Goodwin's affidavit is competent summary judgment evidence that creates a genuine issue of material fact as to whether Goodwin refused a request by Burlington police to waive his Miranda rights and subsequently invoked his Fifth Amendment right to counsel.  See Transamerica Ins. Co. v. Avenell, 66 F.3d 715, 722 (5th Cir. 1995) (holding that an attorney's detailed affidavit, which was competent summary judgment evidence, demonstrated the existence of a genuine issue of material fact regarding a claim for attorney's fees).  The state has presented no evidence reflecting that Goodwin initiated any conversations with police that would have cut off the effectiveness of a previous assertion of the Fifth Amendment right to counsel and thus negated the materiality of the fact issue raised by

40

whether the state court afforded him a full and fair hearing for the resolution of this fact issue.

## 2. Full and fair hearing in state court

As demonstrated above, if the factual dispute as to whether Goodwin ever invoked his Fifth Amendment right to counsel is resolved in Goodwin's favor, he is entitled to habeas relief. For the reasons that follow, we conclude that the state did not afford Goodwin a full and fair hearing on this factual issue and that he is therefore entitled to an evidentiary hearing in federal district court to resolve it.

"There cannot even be the semblance of a full and fair hearing unless the state court actually reached and decided the issues of fact tendered by the defendant." Townsend v. Sain, 372 U.S. 293, 313-14 (1963). As such, when the state court did not resolve a fact issue that would entitle the petitioner to relief if resolved in his favor, the petitioner is entitled to an evidentiary hearing on the issue. See id. at 313; Blackmon v. Scott, 22 F.3d 560, 567 & n.28 (5th Cir. 1994) (concluding that an evidentiary hearing on factual issues underlying a habeas petitioner's federal claims was required because the state court made no fact-findings on the issues).

In determining whether the state court reached the merits of a factual issue, the district court may, in appropriate

---

Goodwin's affidavit. The only other evidence presented by the state was a conflicting affidavit by Goodwin's trial attorney. Thus, a genuine issue of material fact exists regarding Goodwin's Fifth Amendment claim.

circumstances, imply fact-findings from the state court's disposition of a federal claim that turns on the factual issue.

In Townsend, the Supreme Court observed:

> If the state court has decided the merits of the claim but has made no express findings, it may still be possible for the District Court to reconstruct the findings of the state trier of fact, either because his view of the facts is plain from his opinion or because of other indicia.

Townsend, 372 U.S. at 314. The Court went on to state that

> the coequal responsibilities of state and federal judges in the administration of federal constitutional law are such that we think the district judge may, in the ordinary case in which there has been no articulation, properly assume that the state trier of fact applied correct standards of federal law to the facts in the absence of evidence . . . that there is reason to suspect that an incorrect standard was in fact applied.

Id. at 314-15; Dempsey v. Wainwright, 471 F.2d 604, 606 (5th Cir. 1973) ("[I]f the state court did not articulate the constitutional standards applied, the district court may presume that the state court applied correct findings, in the absence of evidence that an incorrect standard was applied.").

In this case, neither the state district court nor the Court of Criminal Appeals made any express findings of fact regarding whether Goodwin requested the assistance of counsel during custodial interrogation when first taken to the Burlington police station. Furthermore, we conclude that neither court made any implicit fact-findings on this issue. In addressing Goodwin's habeas petition, the state courts made no conclusions of law regarding Goodwin's Fifth Amendment claim (or any of his other claims) from which we could infer a factual finding that Goodwin

42

did not refuse police interrogation in the absence of an attorney when first taken to the Burlington police station.  Rather, the district court recommended in a two-page order containing no legal analysis of Goodwin's claims that Goodwin's request for relief be denied, and the Court of Criminal Appeals accepted the recommendation in an even more summary fashion.  A conclusion that the state courts' summary denial of Goodwin's petition for habeas corpus relief implies a finding that Goodwin never invoked his Fifth Amendment right to counsel finds no support in the Supreme Court's jurisprudence and is contrary to this circuit's treatment of implied fact-findings.

In the circumstances in which the Supreme Court has held that a state court has made implied findings of fact, the state court's written disposition of the claim in question has contained explicit conclusions of law.  For example, in Marshall v. Lonberger, 459 U.S. 422 (1983), the Court determined that a state trial court's legal conclusion that a criminal defendant's guilty plea was admissible into evidence implied a factual determination that the defendant's testimony that he had never been given an opportunity to review the indictment for the charged offense lacked credibility.  The Court observed that "[t]he trial court's ruling allowing the record of conviction to be admitted in evidence . . . is tantamount to a refusal to believe the testimony of respondent."  Id. at 434.  However, the trial court's ruling that the confession was admissible contained an express legal conclusion that "the defendant intelligently and

43

voluntarily entered his plea of guilty." Id. at 429 (internal quotation marks omitted).

Similarly, in LaVallee v. Delle Rose, 410 U.S. 690 (1973), the court held that the trial court's legal conclusion that a criminal defendant's "confessions to the police and district attorney were, in all respects, voluntary and legally admissible in evidence at the trial" implied a fact-finding by the trial court that the defendant's testimony that his confessions resulted from police coercion lacked credibility. Id. at 691. The Court stated, "Although it is true that the state trial court did not specifically articulate its credibility findings, it can scarcely be doubted from its written opinion that respondent's factual contentions were resolved against him." Id. at 692. In both of the above cases, the state court had made an express legal conclusion from which the reviewing federal court could accurately reconstruct the factual determinations that formed the basis of the state court's legal conclusion.

The case law of this circuit demonstrates that some indication of the legal basis for the state court's denial of relief on a federal claim is generally necessary to support a conclusion that the state court has made an implied fact-finding as to a factual issue underlying the claim.[16] In Armstead v.

_____

[16] In a few instances, we have held that a state court's bare legal ruling without accompanying conclusions of law may form a basis for implying findings of fact that support the ruling. However, we have done so only in circumstances in which the state court's ruling addressed a discrete issue and the factual basis for the ruling was extremely clear based on the ruling's limited nature. See, e.g., Jones v. Butler, 864 F.2d

44

Scott, 37 F.3d 202 (5th Cir. 1994), the habeas petitioner alleged that his defense counsel was unconstitutionally ineffective because he falsely promised the petitioner that his wife would receive probation if he pled guilty. See id. at 205. The state habeas court made no express findings of fact on this issue and merely denied relief. See id. at 208. This court held that the state court had made no fact-finding--express or implied--on this issue. See id. at 208-09. Likewise, in Blackmon v. Scott, 22 F.3d 560 (5th Cir. 1994), we concluded that a habeas petitioner was entitled to an evidentiary hearing on a number of his claims for habeas relief, the viability of which hinged upon resolution of fact issues, because the state habeas court had not entered fact-findings disposing of the underlying fact issues in denying the petitioner's state habeas petition. See id. at 566-67. We therefore conclude that neither the state district court nor the Court of Criminal Appeals made any implicit findings of fact on the issue of whether Goodwin requested to have an attorney present during custodial interrogation when first taken to the

348, 362 (5th Cir. 1988) (concluding that state court's refusal to dismiss a juror for cause after the defendant's challenge for cause based on lack of impartiality constituted an implicit factual finding that the juror was not biased); Lavernia v. Lynaugh, 845 F.2d 493, 499-500 (5th Cir. 1988) (holding that the trial court's denial of the defendant's motion to suppress an in-court identification and photo spread evidence from an out-of-court identification constituted an implicit fact-finding crediting the identifying witness's testimony indicating that the out-of-court identification procedure was not unduly suggestive); Wicker v. McCotter, 783 F.2d 487, 495 (5th Cir. 1986) (holding that trial court's denial of a motion for mistrial on grounds of pretrial publicity constituted an implicit fact-finding that pretrial publicity had not created "the kind of 'wave of public passion' that would have made a fair trial unlikely").

Burlington police station.[17]  Because the state courts made no fact-finding on this issue, they did not provide Goodwin with a full and fair hearing for its resolution.  Goodwin is therefore entitled to an evidentiary hearing so that the district court may determine whether Goodwin invoked his Fifth Amendment right to counsel, thereby rendering his confessions inadmissible at trial.  "This should not be a wide-ranging fishing expedition, but a brief adversarial hearing concerning a discrete [factual issue]."

---

[17]  We acknowledge that the state district court's recommendation that Goodwin's second habeas petition be denied and the summary denial of the relief sought in the petition by the Court of Criminal Appeals were legally proper only if the state courts concluded, as a factual matter, that Goodwin did not request the assistance of counsel when first taken to the Burlington police station.  Because Townsend instructs us to assume "that the state trier of fact applied correct standards of federal law to the facts," Townsend, 372 U.S. at 314-15, one might argue that we are compelled to conclude that the state courts found that Goodwin never invoked his Fifth Amendment right to counsel.  This argument, however, proves far too much.

As noted above, in order to be entitled to an evidentiary hearing in federal court, a habeas petitioner must demonstrate the existence of a "factual dispute, that, if resolved in the petitioner's favor, would entitle her to relief."  Perillo, 79 F.3d at 444 (internal quotation marks and brackets omitted).  Were we to conclude that, when a state habeas court denies a habeas petition containing federal claims without written findings of fact or conclusions of law, it has implicitly made all of the factual findings necessary to support its denial of the federal claims therein, then we would be forced to conclude that the state court has made implicit findings of fact any time a habeas petitioner makes a threshold showing that he is entitled to an evidentiary hearing.  This is so because we would be forced to conclude that, when the petitioner demonstrates the existence of a factual issue that would entitle him to relief if resolved in his favor, the state court necessarily must have resolved the issue against the petitioner in order for its denial of relief on the federal claim to be valid.  Such an expansive approach to implicit fact-findings would strip Townsend's admonishment that a habeas petitioner is entitled to an evidentiary hearing if "the merits of the factual dispute were not resolved in the state hearing" of all meaning.  Townsend, 372 U.S. at 313.

46

<u>Perillo</u>, 79 F.3d at 445.

### C. Withholding Exculpatory Evidence and Knowing Use of Perjured Testimony by Prosecution

Goodwin advances two arguments relating to the testimony of Delbert Burkett, a witness at Goodwin's trial who was Goodwin's cellmate in the Montgomery County Jail during the early part of 1987. Burkett testified at the sentencing stage of Goodwin's trial that Goodwin had bragged to him about the murder of Tillerson and that Goodwin showed no remorse at having committed the murder. Goodwin alleges that the prosecution (1) knowingly failed to correct Burkett's perjurious testimony during sentencing that he did not testify in exchange for a deal from the state lessening his sentence on a state crime for which he had been previously convicted and (2) failed to inform Goodwin of the existence of a deal between Burkett and the state that would have constituted material impeachment evidence at trial. Goodwin contends that a genuine issue of material fact exists as to each of the above claims, and that he is therefore entitled to an evidentiary hearing on them. We conclude that no such genuine issues of material fact exist and that Goodwin is not entitled to an evidentiary hearing on these claims.

### 1. Knowing use of perjured testimony

"A state denies a criminal defendant due process when it knowingly uses perjured testimony at trial or allows untrue testimony to go uncorrected." <u>Faulder v. Johnson</u>, 81 F.3d 515, 519 (5th Cir.) (citing <u>Napue v. Illinois</u>, 360 U.S. 264 (1959)), <u>cert. denied</u>, 117 S. Ct. 487 (1996). To obtain a reversal based

upon a prosecutor's use of perjured testimony or failure to correct such testimony, a habeas petitioner must demonstrate that "1) the testimony was actually false; 2) the state knew it was false; and 3) the testimony was material."  See id.; Blackmon v. Scott, 22 F.3d 560, 565 (1994).  False evidence is "material" only "if there is any reasonable likelihood that [it] could have affected the jury's verdict."  Westley v. Johnson, 83 F.3d 714, 726 (5th Cir. 1996) (internal quotation marks omitted), cert. denied, 117 S. Ct. 773 (1997).

On April 16, 1987, Burkett was sentenced to five years imprisonment for possession of a controlled substance, having violated the conditions of his previous sentence of deferred adjudication on the offense.  That same day, two other criminal charges pending against Burkett were dismissed.  At trial, Burkett testified that he had received no promises of consideration from the state in exchange for his testimony at Goodwin's trial as of the time of his sentencing on the charge of possession of a controlled substance.  Burkett also testified that he had no idea that the state desired to have him testify until he was bench-warranted from state prison back to Montgomery County in July 1987 to discuss the Goodwin case with prosecutors.[18]  Goodwin claims that a fact issue exists as to the

_____

[18]  On cross examination by Goodwin's trial counsel outside the presence of the jury, Burkett testified as follows:

Q:   And, then you got five years on a controlled
     substance out of Montgomery County?

A:   Yes, sir.

48

. . .

Q:   Had you already spoken to the authorities about
     what you knew that Goodwin had said when you plead
     for the five years?

A:   No.

Q:   Was there any arrangement or deal at all where
     your sentence would be cut or you would not be
     enhanced if you testified against Goodwin?

Q:   No, sir.  The first I found out about it was when
     I was bench-warranted back here on July the 1st.

On direct examination by the state before the jury, Burkett
testified as follows:

Q:   When did you receive your last conviction?

A:   This one now?  April of this year.

     . . .

Q:   At that time had I ever talked to you?

A:   No, ma'am.

Q:   Had anyone ever talked to you about Alvin Goodwin?

A:   No, ma'am.

Q:   Was there any promises made at that time
     concerning testimony against Alvin Goodwin at the
     time you pled?

A:   No, ma'am.

Q:   When did you first become aware that we were aware
     that you might have some testimony concerning
     Alvin Goodwin?

A:   July the 1st.

Q:   And, were you bench-warranted back to Montgomery
     County for that purpose?

A:   Yes, ma'am.

Q:   At the time you were bench-warranted, did you have

49

falsehood of both of these pieces of testimony as well as the state's knowledge of the falsehood.  He therefore argues that the district court erred in denying him an evidentiary hearing to explore these claims.  We disagree.

Goodwin has presented no competent summary judgment evidence creating a fact issue as to the falsehood of Burkett's testimony that the state had not offered him any sort of deal in exchange for his testimony as of the time of Burkett's sentencing on his charge of possession of a controlled substance.  In support of his claim that this testimony was false, Goodwin offers the affidavit of Kathryn Jean Burkett, Burkett's ex-wife.  Her affidavit states that Burkett informed her before he was transported from county jail to the Texas Department of Corrections to serve his five year sentence that "he was going to get at least one, and maybe more of his charges dismissed in exchange for his testimony."  Burkett's alleged statement to his ex-wife only creates a fact issue as to whether he entered a deal with the state prior to April 16, and therefore as to whether his testimony to the contrary at trial was false, if the statement is true.  To that extent, Burkett's alleged statement is hearsay, as it is an out-of-court statement offered to prove the truth of the matter asserted.[19]  See FED. R. EVID. 801(c).  Because Goodwin has

------

any idea why you were being bench-warranted?

A:    Not until I got here and I seen Guy Williams and he told me why.

[19]   Obviously, if Burkett were to testify at an evidentiary hearing that his trial testimony was truthful, the statement

50

not demonstrated that Burkett's alleged statement to his wife fits any exception to the general rule that hearsay is inadmissible, see FED. R. EVID. 802, 803, the statement is incompetent summary judgment evidence. See Barhan v. Ry-Ron Inc., 121 F.3d 198, 202 (5th Cir. 1997). None of the other summary judgment evidence presented to the district court, including the affidavits of the prosecuting attorneys and the numerous affidavits of Burkett, contradict Burkett's trial testimony that the state had offered him no deal in exchange for his testimony as of the time that his sentence for possession of a controlled substance was imposed. Because Goodwin has failed to demonstrate the existence of a fact issue as to the falsehood of Burkett's testimony at trial, he is not entitled to an evidentiary hearing on this issue.

## 2. Failure to disclose the existence of a deal

"The prosecution's suppression of evidence favorable to the accused violates the Due Process Clause if the evidence is material either to guilt or to punishment." Kopycinski v. Scott, 64 F.3d 223, 225 (5th Cir. 1995) (citing Brady v. Maryland, 373 U.S. 83, 87 (1963)). This includes evidence that may be used to impeach a witness's credibility. See id. (citing United States v. Bagley, 473 U.S. 667, 676 (1985)). "[E]vidence is material only if there is a reasonable probability that, had the evidence

---

could be offered to impeach such testimony. However, in such a circumstance, the statement would only serve as evidence that Burkett lacks credibility, not as evidence that he entered a deal with the state prior to April 16 and that his testimony at trial was therefore false.

been disclosed to the defense, the result of the proceeding would have been different." Bagley, 473 U.S. at 682; Kopycinski, 64 F.3d at 225-26. If the prosecution withholds evidence that satisfies the above definition of materiality, then harmless-error analysis is inapposite and habeas relief is warranted. See Kyles v. Whitley, 514 U.S. 419, 435 (1995) ("[O]nce a reviewing court applying Bagley has found constitutional error there is no need for further harmless-error review. Assuming, arguendo, that a harmless-error enquiry were to apply, a Bagley error could not be treated as harmless, since a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different necessarily entails the conclusion that the suppression must have had substantial and injurious effect or influence in determining the jury's verdict." (internal quotation marks and citations omitted)).

Goodwin alleges that a fact issue exists as to whether the state entered into a deal with Burkett pursuant to which Burkett would receive favorable treatment in exchange for his testimony at the sentencing phase of Goodwin's trial. He contends that, if such a deal existed and the state failed to reveal it to him, he is entitled to a new trial on Brady grounds. Goodwin therefore argues that the district court improperly denied him an evidentiary hearing to resolve the factual dispute of whether a deal existed between the state and Burkett. Because Goodwin has offered no competent summary judgment evidence establishing a fact issue as to whether the state had entered a deal with

52

Burkett whereby he would receive favorable treatment in exchange for his testimony, Goodwin is not entitled to an evidentiary hearing on this claim.

In support of his Brady claim, Goodwin offers one of the three affidavits executed by Burkett and an affidavit of Kathryn Burkett. Burkett's affidavit does not establish a fact issue as to the existence of a deal that would satisfy Brady's requirement of materiality. In his affidavit, Burkett states that prosecutors indicated "that they would look into pending criminal matters, which included a probation revocation in Travis County and assistance with [his] parole for the Montgomery County charges." Specifically, Burkett claims that one of the prosecutors "told [him] she could not promise anything concerning the Travis County probation, because it was from another county, but she said she would look into it if she could." Assuming that such a statement by the prosecutor constitutes an agreement, it is immaterial because the potential benefit to Burkett was so marginal that "it is doubtful it would motivate a reluctant witness, or that disclosure of the statement would have had any effect on his credibility." McCleskey v. Kemp, 753 F.2d 877, 884 (11th Cir. 1985) (en banc) (concluding that a detective's promise to "speak a word" for a witness in exchange for his testimony was not reasonably likely to have changed the judgment of the jury had it been disclosed). We therefore conclude that, even if the prosecutor made the "agreement" that Burkett alleges, the agreement was immaterial because there is no "reasonable

53

probability that, had the evidence been disclosed to the defense, the result of the [sentencing stage of trial] would have been different." Bagley, 473 U.S. at 682. This conclusion is bolstered by the district court's observation that the jury, having been informed of Burkett's status as a thrice-convicted felon, already had ample reason to conclude that Burkett "was less than a model of integrity."

The remainder of Burkett's affidavit merely evidences a nebulous expectation of help from the state; such an expectation is not Brady material. See United States v. Nixon, 881 F.2d 1305, 1311 (5th Cir. 1989) (holding that a witness's impression that the government would help him obtain a pardon in exchange for his testimony, in the absence of "a specific promise to help," was not Brady material).

Kathryn Burkett's affidavit likewise fails to establish a genuine issue of material fact with respect to Goodwin's Brady claim. Her affidavit states that Burkett told her that he had made a deal with the state pursuant to which he would receive favorable treatment in exchange for his testimony. However, as noted earlier, such statements by Burkett are inadmissible hearsay, and are therefore not competent summary judgment evidence. See Barhan, 121 F.3d at 202. Kathryn Burkett's affidavit also indicates that she heard Burkett speaking with a state investigator about a "deal," but it provides no indication of the substance of the investigator's statements. The only specific statements by the investigator to which she refers

54

consist of his encouragement that she "stand by Delbert through his prison sentence and . . . make plans for [her] life with Delbert after his short stay in prison."  This statement does not create a fact issue as to whether the state had promised Burkett favorable treatment in exchange for his testimony.

In sum, Goodwin has not established a fact issue as to the existence of a deal between the state and Burkett, the nondisclosure of which would mandate a new sentencing hearing under Brady.  Goodwin is therefore not entitled to an evidentiary hearing on his Brady claim.

## D.  Violation of Constitutional Right to Rehabilitation Expert

Goodwin contends that the district court erred in denying him habeas relief on his claim that the trial court violated his Fourteenth Amendment right to due process by denying his motion for funds to hire a rehabilitation expert to testify at the punishment phase of his trial.  Prior to trial, defense counsel filed a motion requesting funds for the purpose of retaining certain expert witnesses, including "an expert in the area of parole and rehabilitation."  The trial court did not grant the motion.  Neither the state nor the defense proffered psychiatric evidence at sentencing.

In evaluating Goodwin's claim of entitlement to a rehabilitation expert, the district court appears to have applied the standard adopted in this circuit for determining whether an indigent defendant has a right of state-funded access to nonpsychiatric experts.  Under this standard, a criminal

defendant has no due process right to the assistance of such an expert unless the expert testimony to be obtained is "'both critical to the conviction and subject to varying expert opinion.'" See Yohey v. Collins, 985 F.2d 222, 227 (5th Cir. 1993) (quoting Scott v. Louisiana, 934 F.2d 631, 633 (5th Cir. 1991) (citation omitted)). Goodwin contends that the district court erred in applying this standard and should instead have evaluated his claim under the standard articulated by the Supreme Court in Ake v. Oklahoma, 470 U.S. 68 (1985), for determining whether an indigent defendant is constitutionally entitled to the appointment of a psychiatric expert. As support for this proposition, Goodwin argues that, in the context of mental-health evidence presented to the jury during the punishment phase of the trial, there is "no significant difference . . . between the opinions offered by . . . rehabilitation counselors and expert opinions from a mental health professional." Schneider v. Lynaugh, 835 F.2d 570, 571 (5th Cir. 1988). Assuming arguendo that Goodwin would have elicited the type of testimony from a rehabilitation expert that would be the functional equivalent of psychiatric testimony and that this fact would bring his request for an expert within the ambit of Ake, his claim is nonetheless unavailing.

In Ake, the Supreme Court held that an indigent defendant has a due process based right to the appointment of a psychiatric expert to present rebuttal evidence at sentencing "when the State presents psychiatric evidence of the defendant's future

56

dangerousness." Ake, 470 U.S. at 83. The state presented no such evidence in this case. Goodwin argues, however, that Ake requires the appointment of a psychiatric expert whenever the defendant's future dangerousness is "a significant factor" at sentencing. Goodwin acknowledges that his proposed interpretation of Ake would entitle every defendant in a Texas capital case to the appointment of a psychiatrist because imposition of the death penalty requires that the state prove, inter alia, that "there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." TEX. CRIM. PROC. CODE ANN. art. 37.071(b)(1) (Vernon Supp. 1998). This contention is unsupportable.

In Ake, the Court indicated that the due process entitlement to the assistance of a psychiatrist when the state presents psychiatric evidence of future dangerousness is predicated upon the notion that psychiatric testimony offered on behalf of the defendant is uniquely capable of "uncover[ing], recogniz[ing], and tak[ing] account of . . . shortcomings in predictions" made by the state's psychiatrists. Ake, 470 U.S. at 84 (internal quotation marks omitted). It is simply not the case that the types of nonpsychiatric evidence of future dangerousness offered by the state in this case, such as Goodwin's criminal history and testimony that Goodwin bragged about killing Tillerson, are uniquely capable of being rebutted only by psychiatric

57

testimony.[20]  Moreover, subsequent Supreme Court precedent indicates that <u>Ake</u> only creates an entitlement to the assistance of a psychiatrist during sentencing when the state offers <u>psychiatric</u> evidence of the defendant's future dangerousness. See <u>Tuggle v. Netherland</u>, 116 S. Ct. 283, 284 (1995) ("[W]e held in <u>Ake</u> . . . that when the prosecutor presents <u>psychiatric evidence</u> of an indigent defendant's future dangerousness in a capital sentencing proceeding, due process requires that the State provide the defendant with the assistance of an independent psychiatrist." (emphasis added));  <u>Simmons v. South Carolina</u>, 512 U.S. 154, 164 (1994) ("[W]here the State presents <u>psychiatric evidence</u> of a defendant's future dangerousness at a capital sentencing proceeding, due process entitles an indigent defendant to the assistance of a psychiatrist for the development of his defense . . . ." (emphasis added)).

Goodwin relies upon <u>Clisby v. Jones</u>, 960 F.2d 925, 929 n.7 (11th Cir. 1992), and <u>Liles v. Saffle</u>, 945 F.2d 333, 340-41 (10th Cir. 1991), for the proposition that <u>Ake</u> may require the appointment of a psychiatrist in some circumstances in which the state offers only nonpsychiatric evidence of future dangerousness.  However, even if we were to adopt the construction of <u>Ake</u> that these cases advocate, Goodwin's claim

---

[20]  For example, Jesse Sunday, another of Goodwin's cellmates in the Montgomery County jail, testified at sentencing that Goodwin did not brag about killing Tillerson.

58

would nonetheless fail.[21]  Those cases requiring the appointment

of a psychiatrist to aid the defendant during sentencing when the

state has offered only nonpsychiatric evidence of the defendant's

future dangerousness have also required that the defendant

establish that "his mental condition could have been a

significant mitigating factor."  Liles, 945 F.2d at 341; see also

Clisby, 960 F.2d at 929 ("Ake requires a state to provide the

capital defendant with such access to a competent psychiatrist

upon a preliminary showing to the trial court that the

defendant's mental status is to be a significant factor at

sentencing.").  Goodwin has made no such showing.

Goodwin concedes in his appellate brief that, in evaluating

his Ake claim, we should consider only the evidence the trial

court had before it at the time of its ruling denying the request

for court appointment of a rehabilitation expert.  See Williams

v. Collins, 989 F.2d 841, 844 n.10 (5th Cir. 1993). Goodwin's

motion requesting funds to hire a rehabilitation expert states

the following:

> In the event the Defendant is convicted, a punishment
> hearing would be conducted to determine sentencing.
> Because all information pertinent to sentencing must be
> introduced at the punishment hearing, it will be
> necessary for the Defendant's counsel to employ an
> expert in the area of parole and rehabilitation to
> determine, in the event the Defendant is convicted,
> whether he is capable of rehabilitation.  This
> information and expert opinion would be admissible as a
> mitigating circumstance under Texas Law.  The

---

[21]  Because Goodwin is not entitled to relief under the
construction of Ake advocated in Liles and Clisby, we need not
determine whether the law of this circuit supports this more
expansive construction of Ake.

> Defendant's counsel [has] no training or expertise in this field and would be prohibited from testifying, in any event. The estimated cost of such an expert would be $500.00.

Goodwin's motion contains "little more than undeveloped assertions that the requested assistance would be beneficial." See Caldwell v. Mississippi, 472 U.S. 320, 323 n.1 (1985) (internal quotation marks omitted). Goodwin did not present to the trial court any explanation regarding either the purported connection between his mental state and his prospects of rehabilitation or the sort of mitigating evidence relating to his mental condition that the expert he proposed to hire would provide.[22] Accordingly, Goodwin has not made a sufficient showing that he was constitutionally entitled to the appointment of a rehabilitation expert even under the expansive interpretation of Ake advocated in Liles and Clisby. See Volanty v. Lynaugh, 874 F.2d 243, 245 (5th Cir. 1989) (holding that a motion for the appointment of a psychiatric expert based on an

---

[22] Goodwin filed an affidavit of a psychologist explaining the importance of mental health experts in establishing mitigating evidence during sentencing along with his federal habeas petition. Because Goodwin never presented this affidavit to the trial court and has not demonstrated (1) that good cause existed for his failure to adequately develop the factual record of his Ake claim at the state court level and (2) that prejudice would result from our failure to consider the psychologist's affidavit in evaluating his claim, we decline to consider it in evaluating Goodwin's Ake claim. See Livingston v. Johnson, 107 F.3d 297, 306 n.7 (5th Cir. 1997) (concluding that the court could not consider an affidavit indicating the usefulness of hiring a firearms expert when the affidavit had not been presented to the state habeas court absent a showing of cause and prejudice); Williams, 989 F.2d at 844 n.10 ("[I]n evaluating an Ake claim, we should look only to the evidence before the trial judge at the time he ruled on the request for psychiatric assistance.").

allegation that the defendant was temporarily insane at the time of the offense as a result of drug use was insufficient to support an Ake claim absent additional supporting evidence); Volson v. Blackburn, 794 F.2d 173, 176 (5th Cir. 1986) (holding that an attorney's "conclusional allegation" that his client "was unable to understand the difference between right and wrong at the time of the offense" was insufficient to support an Ake claim).[23]  Such allegations are insufficient to demonstrate a need for the assistance of a psychiatric expert.  The district court therefore properly denied Goodwin's request for habeas relief on this claim.

---

[23]  Goodwin also contends that the trial court's failure to grant his motion requesting funding to hire a rehabilitation expert violated his Sixth and Eighth Amendment rights.  Because Goodwin has not explained how his Sixth Amendment rights were violated, he has abandoned this claim, and we need not consider it.  See Brinkmann, 813 F.2d at 748.

Goodwin contends that Eighth Amendment jurisprudence necessitates a broad interpretation of Ake that would require the appointment of rehabilitation experts in any circumstance in which the state offers evidence of future dangerousness.  He argues that, "because death is qualitatively different from any other punishment," the Eighth Amendment requires a correspondingly higher degree of reliability in sentencing determinations that impose death.  However, Ake itself involved a capital sentencing hearing.  See Ake, 470 U.S. at 73.  As noted above, Ake does not mandate the appointment of experts in capital cases in which the state does not offer psychiatric evidence of future dangerousness.  Moreover, to the extent that we are bound to consider only the facts presented to the trial court in determining Goodwin's entitlement to an expert, Goodwin has made no showing that the appointment of an expert in this case would have enhanced the reliability of the sentencing determination.

### E. Constitutionality of Article 8.04(a)
### of the Texas Penal Code

Goodwin argues that section 8.04(a) of the Texas Penal Code, which provides that "[v]oluntary intoxication does not constitute a defense to the commission of crime," TEX. PEN. CODE ANN. § 8.04(a) (Vernon 1994), is unconstitutional and that its effect on his trial entitles him to habeas relief on two bases. First, Goodwin contends that the statute unconstitutionally restricted the jury's consideration of evidence of his intoxication that would have disproven the existence of the specific intent element of capital murder as defined by Texas law.[24] Second, he contends that the statute operated to preclude the trial court's submission of a lesser-included offense instruction to the jury in contravention of Beck v. Alabama, 447 U.S. 625 (1980). Both arguments lack merit.

---

[24] Section 19.03(a)(2) of the Texas Penal Code provides in relevant part that a person commits capital murder if he "intentionally commits the murder in the course of committing or attempting to commit kidnapping, burglary, robbery, aggravated sexual assault, arson, or obstruction or retaliation." TEX. PEN. CODE ANN. § 19.03(a)(2) (Vernon 1994). Conviction of capital murder requires proof that the accused had the specific intent to kill. See Livingston v. State, 739 S.W.2d 311, 336 (Tex. Crim. App. 1987).

62

### 1. Statutory preclusion of voluntary intoxication defense

Goodwin's claim that section 8.04(a) unconstitutionally precluded the jury from considering evidence of Goodwin's voluntary intoxication in determining whether he had the specific intent necessary to commit capital murder is foreclosed by the Supreme Court's recent decision in Montana v. Egelhoff, 116 S. Ct. 2013 (1996). In Egelhoff, the Court upheld a Montana statute which provides, in relevant part, that voluntary intoxication "may not be taken into consideration in determining the existence of a mental state which is an element of [a criminal] offense," Mont. Code Ann. § 45-2-203 (1997), against a due process attack identical to the one advanced by Goodwin. See id. at 2024 (Scalia, J., plurality opinion); id. at 2026 (Ginsberg, J., concurring). In that case, the petitioner challenged his conviction of deliberate homicide on the ground that the Montana statute precluded him from offering evidence of his voluntary intoxication that would have proven that he did not "purposely" or "knowingly" cause the death of another person. Id. at 2016-17 (Scalia, J., plurality opinion). The Court rejected this argument on the ground that the Montana statute "does not offend a 'fundamental principle of justice,' given the lengthy common-law tradition [prohibiting the defense of voluntary intoxication], and the adherence of a significant minority of the States to that position today." Id. at 2025 (Ginsburg, J., concurring); see also id. at 2017-20 (Scalia, J., plurality opinion) (chronicling the common law's historical treatment of

63

voluntary intoxication and listing the ten states that retain the historical prohibition on the defense).[25]  Goodwin advances the same argument as the petitioner in Egelhoff:  that section 8.04(a) violated his right to due process by prohibiting him from offering evidence of his voluntary intoxication in order to negate the existence of the mens rea necessary to support his conviction of capital murder under Texas law.  This claim therefore fails.

### 2.  Statutory preclusion of lesser-included offense instruction

Goodwin also claims that section 8.04(a) of the Texas Penal Code prohibited the trial court from submitting to the jury a lesser included offense instruction on murder in contravention of Beck, 447 U.S. 625.  He argues that, based on evidence of his voluntary intoxication, the jury could have rationally acquitted Goodwin of capital murder and convicted him of noncapital murder. This argument lacks merit.

A defendant is entitled to a lesser-included offense instruction only if "the facts of the case and the laws of the State warrant such an instruction."  Andrews v. Collins, 21 F.3d 612, 629 (5th Cir. 1994) (internal citation and quotation marks omitted).  The Supreme Court held in Egelhoff that the states are

---

[25]  Justice Scalia, writing for himself and three other justices, concluded that the statute was constitutional on the ground that it merely operates to exclude relevant evidence in a manner that offends no "fundamental principle of justice."  See Egelhoff, 116 S. Ct. at 2017, 2024 (Scalia, J., plurality opinion).  Justice Ginsberg concurred, concluding that the statute effects a constitutional redefinition of the mens rea element of criminal offenses under Montana law.  See id. at 2024.

free to prevent jurors from considering evidence of voluntary intoxication; Texas has chosen to do so. As such, the laws of the state foreclose our finding a Beck violation on the basis that evidence of Goodwin's voluntary intoxication could have allowed a reasonable jury to convict him of the lesser-included offense of murder.[26] Because the jury could not consider evidence of Goodwin's voluntary intoxication in determining whether he lacked the specific intent necessary to commit capital murder but possessed a less culpable mental state that would allow conviction of murder, the jury could not have rationally acquitted Goodwin of capital murder and convicted him of noncapital murder. See Mann v. Scott, 41 F.3d 968, 976 (5th Cir. 1994). Goodwin was therefore not constitutionally entitled to a lesser-included offense instruction.

## V. CONCLUSION

For the foregoing reasons, we grant Goodwin's request for a CPC, VACATE that portion of the district court's judgment denying habeas relief on Goodwin's Fifth Amendment claim, and REMAND for an evidentiary hearing on the issue of whether Goodwin invoked

---

[26] We need not resolve the issue of whether section 8.04(a) constitutes (1) an evidentiary rule that precludes the consideration of voluntary intoxication that may be relevant to determining whether a defendant has the requisite mens rea to commit a particular Texas offense or (2) a modification of the definition of mens rea for purposes of Texas offenses that renders such evidence legally irrelevant, and issue over which the majority in Egelhoff divided. See Egelhoff, 116 S. Ct. at 2017 (Scalia, J., plurality opinion); id. at 2024 (Ginsburg, J., concurring). The laws of the state would not support a lesser-included offense instruction based on evidence of voluntary intoxication under either construction of the statute.

65

his Fifth Amendment right to counsel upon being taken to the Burlington police station.  We AFFIRM the judgment of the district court in all other respects.